I'll take up the next case of this morning, number 5-16-0261, Custer v. Cerro Flow Products. Thank you so much. Thank you. I apologize. Have you shown that? That's up to Presiding Justice Moore, not me. Any objection? Is counsel aware of all this? No objection? We'll proceed. Counsel for the appellant, which is which? So you're the appellant? Yes, Your Honor. Okay. You may proceed. Good morning, Your Honors. Counsel? Good morning. I'm King Ford, and with me is Tommy Sursa, and we represent Cerro Flow Products. And may it please the Court. I'd like to begin with what we're not requesting. And what we're not requesting here is for this Court to decide whether the settlement is in good faith. We're asking for something more simple and more limited. We're asking that the plaintiffs in Monsanto, who I will refer to as the settling parties, disclose something that they already know. It's something that's fundamental, and it's something that the trial court and Cerro have never seen. We're asking that the settling parties disclose the results of the blood test, which determined the total amount of the settlement. Now, let me ask a question here, because, you know, these briefs do not limit your request for relief to such a narrow. So now you're coming into this Court saying all you want is the result of the blood test. Is that what you're going to say? Well, what I'm saying is that the blood tests are the driver of the total settlement amount. I mean, because the briefs talk about a whole bunch of things that you want. What we're saying in short terms, we're not asking that the Court rule on good faith. We're saying that unless we know the total settlement amount and how it's allocated, that's the essence of what we're saying. So we are talking about allocation and total settlement amounts, not blood draws. Exactly. We're not looking to drill down to individual results or anything like that. I'm just, as a way of background, discussing that the total settlement amount is driven by the ultimate results of those blood tests. Well, okay. I'm going to let you go on. Thank you. And there's really no reason not to disclose the total settlement amount. After all, among all the many cases that the settlement parties have cited here, going back over 30 years, there's not one case where an Illinois court has ever approved a settlement without knowing the total settlement amount. What about the Lahr case? Did you discuss that? In the Lahr case, that case arises from the tragic nightclub situation in Chicago where 22 people were killed. And the most culpable party in that case filed bankruptcy. And so the total amount was actually disclosed in Lahr. It was $2.5 million. So the court knew the total settlement amount in the Lahr case. It all happened at one time. So it's unlike this case. So among all the cases, there's not one where the court has ever approved a settlement without knowing the total settlement amount, including the Lahr case. And because of that, that is a fundamental that's missing here. The other fundamental we're requesting is how that total settlement amount will be allocated to be disclosed. And that's critical for a settlement involving over 11,000 plaintiffs, involving a wide variety of injuries going back to 1927, 90 years. Part of that, and a big part of that, is the trust agreement, which the settlement agreement itself identifies as being something that outlines the details, the key part of how it's going to be allocated. That trust agreement was never before the trial court. Cyril has never seen it. It's an integral part of all of this, and it's never been disclosed. Now, we agree with the plaintiffs here on one thing, and that is that not every good faith finding requires an evidentiary hearing or some sort of a mini-trial on the merits. On the other hand, though, the Supreme Court in the Johnson v. United Airlines case made very clear that a settling defendant's, quote, potential legal liability is still relevant. And because of that, it's not enough for a good faith finding to simply walk into court and say, you can't prove fraud or collusion, and we're done. This is not a fraud, a no fraud or no collusion test. The test is the totality of the circumstances. And the totality of the circumstances includes the question of whether there's fraud or collusion, to be sure, but it always has included something else. It includes what we refer to as the basic building blocks, the total settlement amount and how it will be allocated, including the trust agreement, which is the key to how it will be allocated. If we don't have these basic building blocks, then all we're left with is scenario upon scenario speculating about, well, it might be good faith or it might not be. There's endless possibilities when you don't know what the total settlement amount is and how it's going to be allocated. If we don't know how it's going to be allocated, we don't know if it's been allocated fairly, and there's any number of ways that it's potentially going to be, could be allocated more favorably or unfavorably to the non-settling defendant. The other thing we don't know is what are the theories of recovery that are, how it's being allocated. And that's critical for the non-settling defendant who has the burden of identifying that it is the same injury that's involved. And that's why the court in the Cianci case and the Moreau case said without having that critical information, any good faith finding would have been premature. This is what confuses me. As you've taken that position you just described, and yet you also said you're not challenging good faith. That seems inconsistent to me. Because, for example, if they've allocated all of the money toward the Ciro facility and no money to any of the other sites, would you say that's in good faith? No. So I don't understand how you come in here and it's not all inextricably intertwined. We don't, I mean, I guess I would put it this way, Your Honor. We don't know until we see what the total settlement amount is or how it's been allocated. If it's been allocated totally to Ciro, it's probably unlikely, but we don't know. And that's the problem. And that's my question. How can you not challenge good faith as well? Not that I want to introduce a new factor. You've conceded. Well, I guess I'd put it this way. Good faith has been a term that's been kind of thrown around a lot in the case law going back 30 years. It used to be, I think, kind of a shorthand for no fraud or collusion. And I think as Johnson points out, it's more than just no fraud or collusion. And what we're getting at here is what the court got into in Cianci. And that is that the court didn't ask for is it up or down, is it in good faith or not in good faith. We're just saying it's premature. And the facts of this case are very close to what the court decided in Cianci. I mean, it could be. I mean, it's possible. If it's remanded, then there wouldn't be a determination of whether it truly is good faith or not. We're just saying at this point, consistent with Cianci, it's premature. Why is it premature? I mean, for example, they've settled. There is a certain amount that's been allocated. Now, I understand you don't know what that is. But what prohibits you from proceeding with your claims? Perhaps a judgment will be entered against you. And then once that is determined, then the setoff is determined. I mean, there is a specific amount, theoretically, that has been allocated against Ciro. I'm assuming that that amount is for certain claims. And I recognize you don't know at this point what they are. But why is it premature? Why can't you proceed with your litigation? And then look to the amounts to determine whether the setoff gets you to zero or $10,000 or $10 million. Why? The reason it's premature, Your Honor, is that until we know the total settlement amount and what that is and how it's been allocated, we can't determine whether the allocation itself is equitable. I mean, the settlement party's argument is, well, you're going to get some settlement at the end, whatever we determine it is. But unlike, say, the Lehrer case, where the court specifically retained jurisdiction to hear objections as to allocation, and the administrator was an independent administrator, in contrast to this case where the trustee is the plaintiff's counsel, it's not a question of getting any setoff. It's, is it equitable? And that's what was really driving the Cianci case and why the Cianci case said, unless you know the numbers, it's premature. And, of course, there's a formula here, and everybody agrees that this case has been the product of a mediation and that there is a formula. But unless you know how that formula works out, you don't know whether that allocation, it might be in good faith, but then again, it might not. And that's a good one. Let's follow your line of reasoning, if I could. Let's suppose that this court remands and says it's premature. Then what is your next action? Our next action, consistent with that, would be, I presume, would be presumably the settling parties then disclose the total settlement amount and disclose how it's going to be allocated, including the trust agreement, which really is the blueprint for how it's going to be allocated. At that point, Ciro has to make a determination. Does this look fair, or do we object? Or is there one part that looks fair or another part that doesn't look fair? There's countless potential scenarios about what might or might not be a fair allocation. At this point, we simply don't know. But if this is disclosed, what concerns me is your countless scenarios about what could happen. So all this time then these plaintiffs are being denied access to their money. True or not true? I mean, while you determine, let me make myself clear because I don't, I'm not fighting with you, I'm asking. So while you determine what your next steps are after disclosure, would you anticipate that the plaintiffs would be denied access to their funds because in your mind something is being allocated inappropriately or whatever? I have to say two parts to the answer here. We have the $10 million, and that's been allocated. Everybody gets the $600. Then we have the three other funds, and those are all driven by the results of the blood test. At this point, I don't know, we don't know exactly when it would be allocated or when it would be distributed. Again, that's something that we don't know. So in terms of holding it up, we don't foresee this is, if it's remanded, it should be limited. Do you know if the money has already been distributed, at least as to the $600? I presume it has, but here again, that's, and here again, it's not knowing what's in the trust agreement. We don't know how this whole thing is working exactly. We'll probably hear from settling parties' counsel on that, but we as the non-settling party don't know that. So in terms of the remand bill, that should not be a full-blown mini-trial in the merits. It's mainly a check, and here again, is it in good faith or not? We don't know until we see it, and that's the essence of what we're talking about here. We don't know until we see it. So what relief are you asking us to give you? Really what the court didn't see on this is a limited remand to allow these critical building blocks to be disclosed, and then it's up to the trial court to use its discretion as to the exact scope of what that would look like. I can't tell exactly until we see it, but that's the essence of it, really what the court heard in Seance, and this is what we're talking about in Seance. The settling parties really don't try to distinguish that. What they do is they have an argument that Seance is a rogue decision, what they call an aberration, and they have cited case after case after case trying to discredit Seance, but none of that really sticks, and it doesn't stick because Seance is a mainstream decision. It's unanimous. It was authored by now Supreme Court Justice Heiss, and in the 12 years since Seance has been decided, it's never been questioned, let alone criticized, and as a matter of fact, in some of the cases that the settling parties cite, they discuss Seance without any criticism. Seance also recognizes and discusses the Supreme Court's decision in Johnson and recognizes that there are times when you don't need a full evidentiary hearing or a limited evidentiary hearing and recognizes that in Seance, the settling defendant, the city of Quincy settled for a nominal amount, but it was clear that they almost for sure had governmental immunity, so there was no real need to do anything, and in Seance, again, the total settlement amount was known, so this idea that Seance is a rogue decision or an aberration, it just doesn't add up. It's a mainstream decision. Counsel, in Seance, there were different theories of liability. Is that correct? Correct. And in this case, is there not really just a single indivisible injury to the plaintiffs? Your Honor, there are potentially multiple injuries, and the complaints have claims for property damage, trespass, nuisance. They have claims for personal injury, negligence. There's a wide array of potential injuries, and unlike some of these other cases where you have cynical incidents, with over 11,000 plaintiffs, you have plaintiffs that are claiming injuries in different decades, going back to 1927, so there's a wide variety of potential theories of recovery. There's a wide variety of potential injuries, different times and different places, so here again, I think, if anything, this case does fit squarely within what the Court was talking about in Seance. What about the idea that the test is the totality of the circumstances, and here we've got mass tort litigation, and that creates an unusual situation. You had the four years of mediation and so forth. How do you... Don't you think that's something that the Court considered? The Court considered that there was this long history of mediation, certainly, but in terms of informing the good faith determination, I don't really think that that can play much of a role, if at all, because after all, the mediation is confidential, and the mediation still doesn't tell us the total settlement amount. The mediation still doesn't tell us the allocation. The mediation still doesn't reveal the trust agreement, so those basic building blocks are still missing, despite the fact that the parties spent a lot of time and effort in mediation, and so that... It may have been something the Court noted, but in terms of deciding good faith, that mediation is really... It doesn't really weigh in the scales. Well, in the mass tort cases, as well as class action cases, the fact that a mediation produces a settlement affects the Court when it considers the objectors who come in and say, this was all done in bad faith, and, of course, the mediation is used to show it was an arm's-length negotiation, so mediation is an important factor. Absolutely, Your Honor. What I'm getting at, and that's exactly right, is that mediation, it does inform it. If we're dealing with the question of fraud or collusion, absolutely, absolutely, but that's not... You know, we've never argued that there's fraud or collusion. We think that's sort of a straw-man argument, that we're not claiming fraud or collusion. We're claiming the other part of the test is that totality of circumstances is more than fraud or collusion. It's whether there's been a proper disclosure of the basics, total settlement and allocation. That's what we're getting at. Does CIRA believe that it has the right to come in, much like an objector would come in in a class action settlement? Do you believe you have the right to challenge the settlement itself, should this be remanded? For example, the blood draw, this random blood draw and how it was decided upon. We've never said that we have a right to, quote, participate in being the architects of the settlement. That's not our role. And the case law makes it pretty clear. That's not something that a non-settling objector has a right to do. What we're saying is disclose the basics. Disclose the basics to us and we'll decide. I have one more question, if I could ask. I have one simple question, very quickly. Does CIRA only have one property at issue in this lawsuit? That's my understanding. Just one, and there's three that are claimed? That's my understanding. Okay. Thank you so much. Thank you, Justice. Counsel, you'll have an opportunity for rebuttal. Thank you, Counsel. Counsel Lee. Good morning. May it please the Court. Ron Hobbs on behalf of Settlement Defendants. I'm here with Mr. Clyde Keene, who represents the plaintiffs, and we would like to split the argument this morning on behalf of the settlement parties. Mr. Keene plans to focus his argument on two Illinois cases, Johnson and Cianci. But I'm starting off, and I'd like to begin with a very short explanation about the big picture and the circumstances for this particular settlement. This is a unique situation, and settling these claims was an enormous challenge.  And two, because these claims allege injury from chemical exposure, which is different from other tort claims, like an auto accident or a workplace accident, where there's an injury-causing event that can be observed. Here, the defendants dispute that plaintiffs have been exposed to any chemicals. They maintain that the tort here, the exposure, never even happened. And plaintiffs, for their part, hire experts to say that there was an exposure. And so, as you might imagine, the parties started very, very far apart, which would make it difficult to settle just one claim, and which made the settlement of 11,000 claims nothing short of remarkable. So how did the settlement happen? Two answers. One, it took a lot of work, and that's all in our brief. Four years, two meat eaters, discovery experts, all of that. Secondly, it took a creative and intelligent settlement design. As I think the Court is aware, each plaintiff received $600 at the outset, just for signing a release and participating. Even if no one was exposed to any chemicals, everyone got $600. And that's $7 million paid just at the outset to cover that by the settling defendants. In addition, there's this main settlement fund. The amount of that fund is determined by whether and to what extent the plaintiffs collectively have been exposed to one of the principal chemicals at issue in this lawsuit, PCBs. So the parties, through their experts, agreed on a testing protocol, and then the settling defendants paid a lot of money to execute that protocol, through which a randomly chosen statistically significant representative group of the plaintiffs was tested for the level of PCBs in their blood. And the higher those levels turned out to be, the higher that main settlement payment. Then once that fund is determined... Is there some kind of grid that works that out? Yes, it's Exhibit 9 to the settlement, Your Honor. There's a direct translation from blood test results to settlement dollars, and that's in the record of CO2-659, Your Honor. Once that fund is built, an administrator divides it somehow among 11,000 people using objective criteria. The point I'm trying to make, Your Honor, is that the main issue in this case, chemical exposure, is literally being measured by the settlement. And the level of exposure translates directly into settlement dollars. That's how 11,000 cases were settled, when the parties started so far apart. A common-sense approach that puts each side's position to the test. Counsel, what about your colleague here, your fellow counsel, Pete? He said, you know, we're missing the building blocks. You know, why wasn't the trust agreement presented to the trial court? The trust agreement has to do only with the allocation. That comes later. There's going to be an allocation. Those documents will be part of the allocation. The court's retained jurisdiction over that. The court's going to oversee that. Those cases where the courts say there has to be an allocation at the time of the good faith finding are cases where you've got no allocation plan, like where you have a wrongful death and a survival plan that are settled together with no division, or a consortium claim and personal injury claim settled together with no division. Those are the types of claims. In fact, that was their argument in their initial brief, that they were going to be deprived of a set-off. And we showed that was incorrect. They're not going to be deprived because everyone's going to get a certain amount. So they come back in their reply brief and say, well, we're not worried about that. We're worried about the set-off being equitable. What about the trust agreement? Why was it not presented? Judge, I've never seen the trust agreement. I represent the settlement defendants. I've never seen the trust agreement. Allocation is not in our hands. We pay the settlement amount, and then that's up to the plaintiffs and the allocator with poor oversight to split. How can that be? That the plaintiffs' lawyers get to decide, without your input, how money is divided. How can that be? Well, because our obligation under the settlement is to pay the final amount based on the blood test. But isn't your obligation to pay an amount that's fair and reasonable based on the injury suffered by the person claiming the injury? I believe that we've done that through the settlement. How do you know? Well, because of the settlement amount. How do you know? Because the settlement amount is calculated by the blood test results. That's where the fairness of the settlement, so to speak, is baked right into the settlement. So you're saying to this court that as the settling party that's put in a fund of money, you are leaving that totally up to the lawyers who represent these people to make that decision, and you've never seen the algorithm for that? To make a decision on allocation on the back end, not a decision as to how much money goes in from the beginning. Okay. Okay, let me ask one other question. So you've paid an amount of money to settle all the claims, right? Correct. You're expecting a release, a general release of all the claims, but I saw that a couple of the claims were for medical monitoring, which is a claim that extends into the future, right? That's right. And you're going to get that dismissed? We already have releases for everything. We have $11,000 releases. So somebody's been paid $600. In order to get a release, did they get $600? At the beginning, correct, plus... Okay, so your $11,000 releases that I saw, those people have already been paid $600? Correct. Have you showed those releases to the other side? Either we've shown them or we haven't had access to them yet. They're all on CDs, which we filed before. Okay, so they know what the language of those releases are? Oh, yes. They know what's being released? Yes. In fact, Exhibits 4 and 5 to the settlements are the templates for the releases, so they've seen those, plus they have access to the actual signed releases. So if they know what's being released, then they know what claims have been released and what claims are still being made against them. But there are three properties at issue here. Was Monsanto released from all three? Monsanto was released for everything. Everything. Correct. So Xero, though, was only in one of the three properties. Well, there's the Monsanto plant, Your Honor, the Xero plant, and the third plant is a landfill. And I frankly don't remember if Monsanto owned it or operated it or had any other affiliation, but it's a plant, a plant, and a landfill. Okay, but my question is this, and I'm getting too slowly. I apologize. Xero only had one-third, potentially, of the liability because it only had one facility. So how is Xero to know what its liability is vis-à-vis Monsanto, who had two of the three? I mean, do we simply take one-third? No, Your Honor. I mean, how do they do that? It doesn't work out to the number of facilities equals the fair share of each party. It depends on what the plants were doing, where the chemicals went, if anybody was exposed. Xero's position is that nobody in this community was exposed to their chemicals either. Their position is their share of liability equals zero. And, of course, once you have exposure, then you have to talk about whether there is causation. This is not like asbestos, right, where you have a chemical or a substance that causes a specific disease. Monsanto's position is its chemicals don't cause these diseases. Xero and Monsanto, we all believe our share is zero because it's an exposure case, and if there was exposure, that's what the settlement is designed to measure. It's not a two-thirds, one-third, Your Honor, based on the number of plants. So the remaining $3 million out of the fund, I assume the fund is being placed at interest, but the remaining $3 million of the fund, how is that to be distributed? That's a credit towards the main settlement fund. What does that mean? Well, Monsanto put in $10 million at the outset. Into some account? Correct, to some account, to wait six months to see if the plans could get enough people interested in the settlement to move forward. Once Monsanto said, okay, there's plenty of people here in the settlement, plenty of people signed up. In other words, they gave you releases. They gave you releases for the $600,000. That's right. The $10 million was moved into account, right? That was to cover all the people who signed releases. The $600,000 of profits came out to about $7 million. The $3 remains in an account, and then once that main settlement fund is determined, and by the way, it hasn't been determined yet. Once it's been determined, that's put into the account, but Monsanto gets a credit against that fund for whatever's left off the $10 million. And how are attorney's fees paid? The administrator, that's in the qualified settlement fund order.  That's a motion. From what? From the entirety of the settlement fund. They're not paid separately. That's between plaintiffs and their lawyers. Okay, so it comes out of the $10 million. Well, it's not just $10 million, Your Honor. It's whatever ultimately gets paid in. And what's the cap on that? If you go through Exhibit 9 and figure out if everybody in that community had the highest possible level of exposure, you can figure out what the highest amount would be. Well, what has Monsanto agreed to? I'm sorry, Your Honor? What has Monsanto agreed to as a cap? Well, there is no cap other than how the math plays out through Exhibit 9. So Monsanto's agreed to put in whatever amount of money this grid determines out of 11,000 people. Right. Whatever it could be, $100 million, and you all would put it in. It's not infinite. I think the amount somewhere in the mid-100-something, it's not infinite. But yes, there's no cap to it other than how Exhibit 9 works out the dollars based on the budgets. Okay. And Exhibit 9 has been shown to the other side. It's in the record. Yes, Your Honor. They got all the exhibits. I don't have the records. Yes. Okay. I can cite you to where it is. It's C-02659. Okay. Thank you. Sorry to interrupt. No, it's all right. So the important thing here with allocation and this trust agreement is that allocation is going to happen. I want to talk about one case on allocation, two things on allocation. First of all, negligence is not an injury. Trespass is not an injury. These plaintiffs have one injury. An injury they claim was caused by exposure to chemicals coming out of these three plants. Whatever these individuals get will be the set-off. This is the Pascal case, which is Illinois Supreme Court in 1995. You do not go in and do set-offs based on negligence and trespass. It's based on the injuries. And they have one injury. So at the end of the day, if Mr. Smith gets $20,000, that's going to be Sero's set-off. Now, an important case on allocation is the Regal case, 2nd District, 1999. And Regal is important, right, because it says the opposite of what Sero represented in his brief. Sero said in Regal the court reversed the good faith finding because there had been no allocation. That's not true. The court in Regal did not reverse the good faith finding. Instead, it remanded the allocation issue and only the allocation issue for wrongful death and survival claims. And at the same time, it affirmed, it expressly affirmed the good faith finding. These are the different issues. There's going to be an allocation. And the reason, Judge, there's a Illinois, I'm sorry, a federal income tax provision called the Establishes Qualified Settlement Fund. That's the idea, as you were talking about earlier, about putting a bunch of money in and having it divided later with the oversight of the court. That's what we have here. That was important in the Lark case that Your Honor mentioned. So in this case, is the trial court going to oversee the allocation? Yes. The court's approved an administrator or that there be a final accountant at the court, right? And so all of this is, they're asking for something that normally has to happen at the good faith finding because the party is out and you have claims that haven't been allocated. Here we have claims that are going to be allocated. Everything that they want is going to happen. And you're saying the final accounting which is required is that review? Yeah. The court's asked for it. It's in their order from August 15th of 2000, August 6th of 2015. So all that allocation is going to happen. I don't know how much time I have left. There's a deadline on that. There's no deadline, Your Honor. Frankly, this is, and that's one of the reasons we're here under these unique circumstances. This settlement has a life of its own. There's like eight phases to this. And we're not even at the phase where we have the settlement dollars yet. Sarah and the plaintiffs are scheduled to go to trial in January, right? So this takes a long time to get through. And that's one of the reasons that the final amount hasn't been figured out yet. But, you know, all those other parts of the settlement have been disclosed to the court and to Sarah. Right? All the formulas for figuring out. They're saying they didn't see the trust agreement. They didn't say the settlement agreement. You're saying they've seen it, which is true. I haven't seen the trust agreement. So they haven't seen the trust agreement? No. Well, I don't understand why not. Because the trust agreement is only for allocation, which hasn't happened yet. But still, why isn't the formula? Has the court seen the trust agreement? Has the trial court seen the trust agreement? I'm not even sure there is a trust agreement, Your Honor. Wait. The independent administrator, under the court's supervision, reporting back to the court, is going to find out a way to use an objective criteria to divvy all of this up. On the back end, that's the part that hasn't happened yet. They can go into court and they can say, we want to see the final evidence. We want to see how it was done. All of that is yet to come. They haven't lost their argument on that. They haven't lost anything. You know, I'm a little concerned that you represent the trust agreement and then you make a comment kind of offhandedly that you're not sure there's a trust agreement. Well, because it's not an exhibit to the settlement. I'm sorry? It's not an exhibit to the settlement. It was always meant to come later when it came to allocation. It's not an exhibit to the settlement. The allocation is not an independent allocation as we would think of it. It's the plaintiff lawyers, right? Well, except that there's been a special administrator that's been approved by the court and is subject to his jurisdiction is going to come report back to the court on the final numbers. That's reporting back before or after the money is paid? I mean, once you pay the money, it's tough to take it back. Well, the money gets paid out individually. Yeah, the $600 that you've all paid. Right, the money. And the releases that you've all gotten. If this court remands and the trial court would find that that isn't an equitable amount, you can't get that $600 back. So it's like putting a genie back in the box. You can't do that. Well, the $600 gets paid out no matter what. My question is about the trust agreement. As Justice Overstreet said, who's going to monitor whether this allocation, and I'm not sure now whether there is or is not a trust agreement. I guess we'll have to ask Mr. Keene. But who's going to monitor whether that is a fair allocation or not? The trial court. So there is some provision that the trial court is going to monitor that or approve it? When the plaintiff's decided to get, there's a provision in the agreement, I believe it's Paragraph 5, that allows the plaintiffs to utilize a special administrator to dimmy everything out. When the plaintiffs decided they wanted to go in that direction, they approached the court in August of 2015 and said, we want to set up a qualified settlement fund and we want a special administrator. That was after the settlement was done. And Judge Barasiewicz, I believe, approved the motion for a qualified settlement fund and approved the administrator specifically and retained jurisdiction over him with the purpose of there being an allocation at a later date. And you think that's the August 6, 2015 order? Absolutely, Your Honor. Okay. Absolutely. Every argument that they've made about this is what we want with allocation, they're going to get all of that when allocation happens. They haven't lost anything with allocation. They're really mixing apples and oranges when it comes to these cases about claims that have been settled together like injury and consortium claims when nobody ever intended an allocation, and the appellate court said, wait a minute, you've got to go back and split these up for a set-up. Here we're going to have the allocation happen. That's when, if there is a trust agreement, when it will come into play. I've seen these in class action cases but in not mass action cases where you have individuals, where you have a fiduciary relationship to a class as opposed to a fiduciary relationship to individuals. You have the lawyers. And I saw some reference to the fact that the distribution would be pursuant to the rules of ethics or some language like that. So this trust agreement seems to be an important piece for the court, the trial court. So has Judge Lopeno and Judge Gleason seen this trust agreement? Has it been disclosed to at least the court? I don't believe so, and it's because it's not relevant yet. We haven't gotten an allocation yet. We're not even there. That's the next phase that's going to happen in front of Judge Gleason and Lopeno. Well, the format for figuring out what's fair is part of the good faith settlement, isn't it? No, that was my point earlier, Your Honor. No, so the format of what is to be distributed in your argument is not relevant. It's not part of the good faith finding. The good faith finding, as the Riedel case says, is separate. Remember, Riedel remanded the allocation because they weren't going to do one or they hadn't done one and said, well, we're also going to approve the good faith of the settlement. The settlement is in good faith for all the reasons we've set out in our brief because whatever Monsanto's culpability might be is baked into the agreement. And the court, contrary to what has been represented, the court did consider all of those elements and even commented on how much money had been paid in, and everybody had the formulas and the dollars for how much was put into the agreement on the front end. That should end for the settlement defense. Once we've paid the money and there's been a good faith finding, the allocation has nothing to do with us. It has to do, the two people with an interest in the allocation are the plaintiffs and to some extent, Sarah. If Sarah thinks it's got to be inequitable, and the court's going to oversee it. Sorry, Mr. King. Good morning, sir. Good morning. We're both. This trust agreement is integral to how the settlement works. I'm just going to read a sentence from the settlement agreement. This is at page 88 of our appendix. We reference this at page 12 of our brief. And it states, the trustees will also be governed by a trust agreement which will outline in detail the distribution method for the settlement funds. And it goes on. Now I'm hearing for the first time this morning that not even Monsanto has seen this trust agreement. How can any court issue an order of good faith without knowing how the most basic document to allocate has not been disclosed? What about Monsanto's argument that, hey, it doesn't matter to us, we're going to put some money into a fund and you all handle it the way you want to and there's going to be a court supervision? Much like class actions are settled, big class actions are settled. They put in a fund and the court oversees the distribution. This is not how it's been set up here. What's different about it? Here's what's different. It's unlike the bar case where you have an independent administrator. The administrator here is bound up with plaintiff's counsel in how they're going to work together. And the settlement agreement even states that the motion for the qualified settlement funds even states and this is at page C982 of the record, paragraph 1. This is not a motion for a good faith finding or any other request for settlement approval. The settlement itself is set up so that all that the settling parties have to do is make an accounting after the funds apparently have been paid, after the horses are already out of the barn. And the trial court then may request the accounting. There's no provision in there that the court's going to retain jurisdiction over any objection that Cyril might have that, wait a second, these allocations aren't fair. I mean, counsel, your concern isn't with what Monsanto's put into the fund. It's your right to settle. Is that correct? That's one part of it. But the other part is what's the settlement amount in total? And how does that relate to the overall liability? What the Supreme Court said in Johnson, the settling dependents' potential legal liability. I mean, that's the other major part of what we're talking about here. It's protecting our settle, but it's also the disclosure of the total settlement amount and whether that is in fact fair. And that's why we keep coming back to these basic building blocks that are just absent. And you don't think this final accounting that's been referenced by the court order protects you? No, because all it says is that the trial court may request an accounting. We don't know what that – there's no assurance that – it doesn't even say that Cyril might have access to the accounting. So, you know, we can go in and argue and say, well, we think we're entitled to this, that, and the other thing, but if the other side wants to stand on the four corners of the document, the four corners of the document do not say that the court's retaining jurisdiction to entertain any objections that Cyril might have as to the allocation. This doesn't say that. And so in order to protect our rights, that's why we're saying it's a modest request. Send it back for a remand just on the building blocks, and the court can sort that out. But the notion that everything has been decided now because we've got this Exhibit 9, which, by the way, the trial court never saw before it was approved. And this – it has these different percentiles. Well, that's an interesting formula, but we don't know whether there's five people in one percentile or there's 100. That makes all the difference in the world if we don't know that. And there is a cap for the 95th percentile. It says it's capped at 1.2 point – 1,250,000. Thank you, counsel. The court will take this matter under advisement and issue a disposition to the court. We'll recess.